**UNITED STATES of America, Appellee,**

**v.**

**Jacob WASHINGTON, Robert Hickman, and Jerome Washington, Defendants–Appellants,**

**Frank Salas, Marlon Douglas, Stephen Collins, and Percy Culcleasure, Defendants.**

**Nos. 314, 319 and 341, Dockets 94–1007, 94–1065 and 94–1141.**

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1994.

Decided Feb. 7, 1995.

Gregory L. Waples, Asst. U.S. Atty., Burlington, VT (Charles R. Tetzlaff, U.S. Atty., for the D. VT, David V. Kirby, Chief, Crim. Div., John P. Tavana, Asst. U.S. Attys., of counsel), for appellee.

Richard C. Bothfeld, Essex Junction, VT, for Robert Hickman.

Bonnie Barnes, Middlebury, VT (Sessions, Keiner, Dumont and Barnes, P.C., of counsel), for Jerome Washington.

Mark A. Kaplan, Burlington, VT (Jarvis & Kaplan), for Jacob Washington.

Before: LUMBARD, CARDAMONE, and MINER, Circuit Judges.

LUMBARD, Circuit Judge:

Jacob Washington, Robert Hickman, and Jerome Washington appeal from judgments of conviction entered between December 1993 and March 1994 in the District of Vermont (Parker, J.), of charges arising from a conspiracy to distribute cocaine. A jury found all three defendants guilty of conspiring to distribute cocaine, in violation of 21 U.S.C. § 846, and found Jacob and Hickman also guilty of using a communication facility in furtherance of this conspiracy, in violation of 21 U.S.C. § 843. In addition, Jacob was convicted of seven counts of distributing cocaine, in violation of 21 U.S.C. § 841; one count of possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841; five counts of possessing firearms as a convicted felon, in violation of 18 U.S.C. § 922; and two counts of using firearms in relation to drug transactions, in violation of 18 U.S.C. § 924. Finally, the jury found Jerome guilty of two counts of distributing cocaine, in violation of 21 U.S.C. § 841; and one count of possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922. The court dismissed the latter charge against Jerome, due to insufficient evidence that the firearm in question was obtained in interstate transport.

The court sentenced Jacob to a twenty-five year prison term for the use of a firearm counts, a consecutive 235 month term for the conspiracy, distribution, and possession counts, and concurrent terms of 96 months for the communication facility count and 120 months for the firearm possession counts. The court sentenced Hickman to a 264 month prison term for the conspiracy count, and to a concurrent 96 month term for the communication facility count. The court sentenced Jerome to a 121 month prison term for the conspiracy and distribution counts.

On appeal, the defendants claim numerous pre-trial, trial, and sentencing errors. We affirm the judgments of conviction.

I.

The defendants were tried on an indictment charging them and six co-defendants—Frank Salas, Dexter Wilson, Marlon Douglas, Stephen Collins, Percy Culcleasure, and Chance Marden—with offenses arising from a conspiracy to distribute cocaine in Burlington, Vermont between May 1991 and May 1992. The six co-defendants all entered guilty pleas.

The evidence at trial showed that in February 1991, Hickman conspired with Salas, Wilson, and Douglas to transport cocaine from New York City for sale in Burlington. That summer, Salas abandoned the enterprise; Hickman replaced him with Jacob, who sold cocaine from Wilson and Douglas's apartment at 106 Hill Gardens in Burlington over a five month period.

Chance Marden began purchasing cocaine from Jacob in the summer of 1991. In the fall, Marden, Jacob, and Judd Colby moved into an apartment at 120 Hill Gardens, and

distributed cocaine from this address. Jacob received regular shipments of cocaine from Hickman, and paid him through Western Union money transfers. In November 1991, Jerome moved in with Jacob, Marden, and Colby. Although Jerome did not initially sell cocaine, in December he began taking a share of Jacob and Marden's cocaine, selling to Marden's customers if Marden was out. At the same time, Wilson, Douglas, Collins, and Culcleasure sold cocaine from nearby apartments. In March 1992, Jacob and Jerome moved to 55 Monroe Street, where they continued selling cocaine.

■ Allen Robertson, a police informant, made controlled purchases of cocaine both at 120 Hill Gardens and 55 Monroe Street. Burlington Detective John Lewis, who strip-searched Robertson before and after each purchase, provided Robertson with a recording device and "buy money." Robertson made purchases from Jacob on February 11, February 17, March 13, April 29, May 1, and May 19, 1992, and from Jerome on February 24 and May 21, 1992.[1] Robertson also made purchases on February 21 and March 5, 1992, when both Jacob and Jerome were present. On each occasion, Robertson gave the cocaine to Detective Lewis.

During this time, Jacob, who had a prior state felony conviction, acquired two 12–gauge shotguns, an Intratech 9mm pistol ("Tech 9"), and .380 and .45 caliber pistols. Several witnesses saw loaded firearms in Jacob's bedroom, where he conducted drug sales. Witnesses also reported that Jacob said he was prepared to "shoot" should a police raid occur. When detectives searched Jacob's apartment during a May 22, 1992 raid, they found a shotgun protruding from beneath the couch on which Jacob was lying, five packets of cocaine on a nearby table, a loaded Tech 9 stashed between the mattress and the box spring in Jacob's bedroom, and one quarter-ounce of cocaine in the bedroom closet. Photographs obtained from the apartment during the search showed Jacob holding various firearms and large sums of cash.

## II.

■ Jacob claims that the government violated the Speedy Trial Act by failing to file an indictment within 30 days of his arrest on May 22, 1992. We disagree. After arresting Salas and Hickman on June 9, the government requested a 45–day extension under 18 U.S.C. § 3161(h)(8)(B)(iii), citing the complexity of its investigation. As this extension was "reasonably related to the needs of the case," *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1197 (2d Cir.), *cert. denied,* 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989), grant of the request was proper. Jacob's complaint, that the extension enabled the government to conduct a more thorough grand jury investigation than it could have conducted otherwise, does not satisfy the required showing of prejudice, *see United States v. Tedesco,* 726 F.2d 1216, 1221–22 (7th Cir.1984).

Jacob and Jerome argue that the warrant authorizing the search of their apartment was invalid, and that the evidence seized in that search should have been suppressed. The warrant authorized seizure of the following items:

1. Any and all forms of cocaine and/or unlawfully possessed regulated drugs.

2. Any and all drug paraphernalia to include: scales, packaging materials, cutting agents, user paraphernalia (pipes, syringes) etc.

3. Any and all papers, records, receipts, documentation, telephone lists and records which may be related to illicit drug activities.

4. Any and all money acquired through illicit drug activities.

5. Any and all firearms and ammunition used to facilitate and/or protect the illicit drug dealing and records [of] firearms purchases.

---

1. The indictment, apparently through inadvertence, charged Jacob, not Jerome, with the May 21 sale. However, in light of both Marden's testimony of a joint venture among himself, Jerome, and Jacob, and Jacob's presence at this sale, the jury could convict Jacob for the substantive offense as a co-conspirator. *See Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946).

Defendants argue that the description of items to be seized was too broad, citing *Buck v. United States,* 813 F.2d 588 (2d Cir.), *cert. denied,* 484 U.S. 857, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987). We disagree.

■ Unlike the search request we criticized in *Buck,* Detective Lewis's affidavit fully stated the facts supporting his warrant request: the continuous sale of small quantities of cocaine from the apartment, and the presence of multiple firearms in the apartment. Unlike the warrant in *Buck,* the warrant issued to Lewis recited the specific categories of drug-related evidence sought. Given the nature of Jacob and Jerome's enterprise, the warrant described with sufficient particularity the criminal instrumentalities to be found at their premises. *See United States v. Young,* 745 F.2d 733, 758–60 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Dunloy,* 584 F.2d 6, 10–11 (2d Cir. 1978).

Jacob, Jerome, and Hickman complain of the court's denial of their motions for change of venue and the court's conduct of *voir dire.* On May 24, 1992, Jerome shot and wounded Marden, whom Jerome believed responsible for the May 22 raid; he also shot and killed Marden's girlfriend, Melissa Wells. Jerome was convicted in the state court of Wells's murder before this case came to trial. Defendants contend that common knowledge of these events within the venue prevented their fair trial.

■ Pretrial publicity included local newspaper and television coverage of (1) the drug arrests, (2) Jerome's murder conviction, and (3) the effects of Melissa Wells's death on the community. Defendants further argued that as three black men from New York City, they could not obtain an impartial jury from a largely white population in a rural area. The district court determined that defendants failed to show "that any negative publicity has so permeated the community with prejudice" as to create a reasonable likelihood of compromising their right to a fair and impartial jury. *United States v. Washington,* 813 F.Supp. 269, 273 (D.Vt.1993). During *voir dire,* the court excused any jurors who either (1) knew of Jerome's guilty verdict in the trial for Wells's murder, or (2)

had formed an opinion about the case that prevented their impartial deliberation. The court did not excuse jurors reporting exposure to pre-trial publicity who stated that they could try the case fairly. The court inquired whether any of the remaining panel members had beliefs about drugs, firearms, defendants' race, or the fact that defendants hailed from New York City, that would prevent their impartial deliberation; no juror so indicated. We believe that the court acted within its discretion in denying the motion for change of venue. *See Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

■ The court did not inquire specifically into each juror's racial attitudes during *voir dire.* Yet the defendants point to no racial dimension in either the alleged crime, the charges brought against them, or the evidence presented that would mandate such inquiry. Because racial considerations were not a central aspect of the charges here, as they were in *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), and *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the court's general inquiry was sufficient to dispel any "reasonable possibility that racial or ethnic prejudice might have influenced the jury." *Rosales–Lopez v. United States,* 451 U.S. 182, 191, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981).

■ Jacob and Hickman further complain of the court's denial of their severance motions. The defendants contend that they were prejudiced by the jury's knowledge of Wells's murder and the related state court proceedings against Jerome. The court, however, removed from the jury panel any juror who either knew of Jerome's state conviction or otherwise expressed an inability to render an impartial verdict based solely on the evidence at trial. Further, none of the jurors who were actually seated indicated knowledge of Jerome's state court proceedings. Finally, the court severed a witness retaliation count against Jerome, so that the jury would hear no evidence about Jerome's shooting of Marden and Wells. Consequent-

ly, there was no need for the court to grant a severance to Hickman and Jacob.

### III.

Jerome raises a double jeopardy claim regarding his conviction for selling cocaine on February 21, 1992. The claim stems from Judge Parker's oral grant of acquittal to Jerome on this charge and subsequent reversal.

The principal testimony for this charge came from Robertson. He testified that both Jacob and Jerome were present at the Feb-. ruary 21 sale, but initially expressed uncertainty about who actually made the sale; he attributed the sale to Jerome only after his recollection was refreshed by review of Detective Lewis's contemporaneous report. Consequently, at the close of the government's case, Judge Parker orally granted Jerome's motion for acquittal of both this charge and a charge relating to the March 5 sale that involved similar evidence. Judge Parker specifically rejected the government's contention that Jerome's mere presence at these sales was sufficient to justify conviction as a co-conspirator under *Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). Judgment of acquittal was not entered at this time, and trial resumed. Jacob briefly called his first witness, who testified as to Marden's relationship with Jacob. The court then adjourned for lunch; Judge Parker expressly declined Jerome's request to inform the jury of the dismissed charges before adjournment. During adjournment, Judge Parker reviewed the government's *Pinkerton* theory. After adjournment, he informed the parties that based on this review, he was reversing his prior grant of acquittal.[2]

Jerome argues that his constitutional right against double jeopardy barred Judge Parker's reversal of his prior ruling. We disagree.

■ An oral grant of a motion for acquittal is "no more than an interlocutory order," which the court has "inherent power to reconsider and modify ... prior to the entry of judgment." *United States v. Lo-*

*Russo*, 695 F.2d 45, 52–53 (2d Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *see also United States v. Baker*, 419 F.2d 83, 89 (2d Cir.1969), *cert. denied*, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970). Such was the nature of the court's ruling here; the court exercised the earliest available opportunity—the adjournment for lunch—to reconsider and modify its order. Unlike the district court in *United States v. Blount*, 34 F.3d 865, 868–69 (9th Cir.1994), which improperly reinstated a lesser-included misdemeanor charge after previously announcing its unqualified dismissal of a felony charge to the jury, the court here reversed its own ruling outside the jury's presence and in a timely fashion. Such conduct did not subject Jerome to a "second trial" or "successive prosecution." *See LoRusso*, 695 F.2d at 53–54.

■ Jerome also argues that because Jacob had already put on his first witness, Judge Parker's reversal was barred by the rule that a motion for acquittal made at the close of the government's case must be decided before the defense begins. *See United States v. Thomas*, 987 F.2d 697, 704–05 (11th Cir.1993). We disagree. The rule's purpose is to enable a defendant to test the sufficiency of the government's case before mounting his own defense. *See* Charles A. Wright, 2 *Federal Practice and Procedure: Criminal* §§ 461–62 (2d ed. 1982). To this end, a court may not consider any evidence introduced in the defense case in deciding the defendant's prior motion; the motion must be granted if the government's case-in-chief presents insufficient evidence to sustain a conviction. *See Thomas*, 987 F.2d at 705. Thus, the rule did not bar Judge Parker from reversing his prior ruling after the defense began its case, but simply barred him from considering any evidence presented by Jacob in making that decision. As Judge Parker complied with this requirement, his reversal of his prior oral ruling was permissible.

### IV.

Jacob and Jerome challenge the sufficiency of the evidence to sustain their convictions.

***

**2.** The jury, however, found Jerome not guilty of distributing cocaine on March 5.

First, both defendants argue that their convictions were defective because the evidence at best established their participation in more limited conspiracies, not the nine-person conspiracy charged in the indictment. We disagree.

 As to Jacob, the government needed only to show that he "agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Aracri*, 968 F.2d 1512, 1521 (2d Cir.1992) (citation omitted). A conspiracy is not altered merely by a "change in membership, or a shifting emphasis on its locale of operations." *Id.* (citations omitted). The government satisfied its burden by showing that Jacob knowingly took Salas's place in the original scheme, and continued selling pursuant to this scheme even after moving out of Wilson and Douglas's apartment.

 As to Jerome, we agree that the government did not show his awareness of a conspiracy extending beyond himself, Hickman, Marden, and Jacob. Yet because variances are subject to the harmless error rule, *id.* at 1519; *see also United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), Jerome further must show a substantial likelihood that the jury considered evidence of the broad conspiracy charged in the indictment in deciding his guilt of the more limited conspiracy established by the evidence. *See United States v. Coy*, 19 F.3d 629, 634 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 525, 130 L.Ed.2d 429 (1994). Because the government predicated Jerome's co-conspirator liability solely on its showing that he distributed cocaine jointly with Jacob and, for a time, with Marden, we see no reason to believe that the jury convicted Jerome on evidence unrelated to his own alleged activity.

Jerome and Jacob also challenge their convictions for cocaine distribution. As several witnesses, including Robertson, provided ample evidence of their sales, this challenge has no merit.

 Jerome separately challenges his conviction for the February 21, 1992 sale. Although the sale occurred in Jacob and Jerome's joint presence, the district court indicated that the evidence was insufficient to show that Jerome personally made the sale. Nonetheless, other evidence showed that Jerome and Jacob participated in a joint venture, which is sufficient to sustain the jury's conviction of Jerome on this alternative basis. *See Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946); *cf. Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (requiring affirmance where evidence is sufficient on one of two alternative bases for conviction).

Jacob challenges his conviction of using or carrying a firearm in relation to drug trafficking, in violation of 18 U.S.C. § 924(c). Jacob was convicted on two such counts, based on the presence of a loaded Tech 9 in his bedroom during (1) the sale of cocaine to Robertson on March 5, 1992 and (2) the May 22, 1992 search. Jacob argues that because Robertson was uncertain who made the March 5 sale, and because the sale occurred outside the bedroom, the Tech 9 was not "used" in relation to this offense. Similarly, Jacob argues that the Tech 9's situation between a mattress and a box spring made it unavailable for use on May 22. We disagree.

 Section 924(c) applies where possession of a firearm is "an integral part of the predicate offense and facilitates the commission of that offense." *United States v. Meggett*, 875 F.2d 24, 29 (2d Cir.), *cert. denied*, 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989); *see also United States v. Torres*, 901 F.2d 205, 217–18 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). The evidence showed that Jacob conducted cocaine trafficking in his bedroom, and that he had expressed readiness to use his firearms to protect his trade. It was reasonable for the jury to find that (1) Jacob's possession of the Tech 9 on March 5 was integral to his role in that day's sale, regardless of where the sale occurred or who made it, and (2) the Tech 9's continuing presence in the bedroom facilitated Jacob's possession of the cocaine found in his closet in the May 22 raid.

Defendants also make a variety of other contentions regarding the sufficiency of the evidence and the conduct of trial, none of which merit discussion.

## V.

 Finally, Jacob and Jerome appeal from their sentences. First, they challenge the court's drug quantity determination. The court held Jacob responsible for distributing 3.32 kilograms, and Jerome for distributing 700 grams. The evidence showed that Jacob wired at least $73,000 to Hickman. Jacob stated to Robertson that he purchased cocaine at $650 per ounce, and the court noted that even a price of $1,000 per ounce would yield an amount in excess of two kilograms. Such evidence supports the court's setting of Jacob's base offense level at 28 under Guidelines section 2D1.2. The evidence also showed that during Jerome's residence at 120 Hill Gardens and 55 Monroe Street, Jacob engaged in the continuous sale of cocaine, and that Jacob transferred more than $22,000 to Hickman after Jerome began distributing. This evidence supports the court's setting Jerome's base level at 26 under section 2D1.2, based on its finding that sale of some quantity greater than 500 grams occurred in furtherance of the conspiracy entered by Jerome and was reasonably foreseeable to him.

Next, Jerome objects to a 2–level adjustment under section 2D1.2(a)(1) for distribution of over 500 grams of cocaine within a protected area. Yet Jerome does not dispute that he lived within 1,000 feet of a school at all relevant times, and the evidence shows that all the sales attributed to Jerome occurred at his places of residence.

 Jerome also objects to a 2–level adjustment under section 2D1.1(b)(1) for possession of a firearm. At sentencing, the court stated that Jerome "possessed firearms." Although the court did not indicate what firearms Jerome possessed, section 1B1.3(a)(1) directs it to consider any acts that occur in an attempt to avoid responsibility for the offense. The jury convicted Jerome of possessing a firearm on May 24; as the court knew, on this day Jerome shot Marden, whom he believed had disclosed the conspiracy to the police. We see no need to remand for more particular findings of fact.

 Finally, Jerome objects to a 2–level adjustment under section 3C1.1 for obstruction of justice. This adjustment is applicable when a court determines that a defendant committed perjury. *United States v. Shonubi*, 998 F.2d 84, 87–88 (2d Cir.1993). Perjury consists of willfully giving false testimony on a material matter under oath. *Id.* at 87. At trial, Jerome denied selling cocaine to Robertson or anyone else, and denied any awareness of Jacob's drug activities. At sentencing, the court determined that Jerome willfully gave false testimony in an attempt to escape a finding of culpability. The record amply supports this determination.

We have considered all of the defendants' arguments and find them without merit.

Affirmed.