### UNITED STATES of America

v.

Larry MILLER; Robert J. Tavano, Sr.; Lewis Tavano; Nick Miller; Victoria Glines; Tim Glines; Richard Rancati; Doron Yakir; John Fountain, a/k/a "Chick"; Rex Seitz; Fabian Hart; Gail Hart; Loran Thompson; Charles White, a/k/a "Buck"; Larry Thompson, a/k/a/ LT; Dana Leigh Thompson, a/k/a Dana Leigh Bush; Sheila Loran; David Mainville; Anthony Laughing; Robert Browning; and L. David Jacobs, Defendants.

No. 97–CR–199.

United States District Court, N.D. New York.

Oct. 7, 1998.

nied such process.

Bond, Shoeneck & King, Syracuse, NY, for defendant Lewis Tavano; George H. Lowe, of counsel.

Office of John P. Bartolomei & Associates, Niagara Falls, for defendant Lewis Tavano; John P. Bartolomei, of counsel.

Office of Albert J. Krieger, Miami, FL, for defendant Robert Tavano, Sr.; Albert J. Krieger, of counsel.

Office of Edward Z. Menkin, Syracuse, NY, for defendant Robert Tavano, Sr.; Edward Z. Menkin, of counsel.

Office of James F. Greenwald, Syracuse, NY, for defendant Nick Miller; James F. Greenwald, of counsel.

Office of Lisa A. Peebles, Central Square, NY for defendant Victoria Glines; Lisa A. Peebles, of counsel.

Office of John A. Piasecki, Malone, NY, for defendant John Fountain; John A. Piasecki, of counsel.

Office of Stanley L. Cohen, New York City, for defendants Fabian Hart and Gail Hart; Stanley L. Cohen, of counsel.

Office of Emil M. Rossi, Syracuse, NY, for defendant Loran Thompson; Emil M. Rossi, of counsel.

Office of Geoffrey S. Stewart, New York, NY, for defendant Charles White; Geoffrey S. Stewart, of counsel.

Zdarsky, Sawicki & Agostinelli, Buffalo, NY, for defendants Larry Thompson and Dana Leigh Thompson; K. Michael Sawicki, of counsel.

Office of Lynne F. Stewart, New York City, for defendant Sheila Loran; Lynne F. Stewart, of counsel.

Office of James McGraw, Syracuse, NY, for defendant L. David Jacobs; James McGraw, of counsel.

Thomas J. Maroney, Office of the United, States Attorney, Syracuse, NY, for the United States; Gregory A. West, Ausa, of counsel.

Office of Richard P. Ferris, Utica, NY, for defendant Larry Miller; Richard P. Ferris, of counsel.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

On July 20, 1998, this Court heard oral argument and decided from the bench numerous discovery motions made by defendants.[1] The Court now addresses defen-

---

**1.** On September 2, 1998, the Court also heard oral argument regarding defendants' motions for dismissal of the money laundering counts.

dants' remaining motions, seeking variously: to strike surplusage from the indictment; dismissal of the indictment; and the return of seized property.

For the reasons that follow, defendants' motions are granted in part and denied in part.

## I. BACKGROUND

### A. The Government's Allegations

On July 10, 1997, a grand jury indicted twenty-one defendants on various counts of a seven-count superseding indictment, alleging that defendants smuggled tobacco and liquor products from the United States to Canada across the St. Regis Mohawk Indian Reservation ("Reservation"). The smuggling scheme, according to the indictment, was designed to avoid the payment of duties and taxes levied upon the importation of tobacco and liquor products by Canada.

The Reservation, consisting of a six-by-five mile strip of land straddling the international border between the State of New York and the Canadian provinces of Ontario and Quebec, allegedly acted as the conduit for the smuggling operation due to its unique geography. The government asserts that the smuggling scheme operated by certain defendants purchasing imported Canadian-brand tobacco products from Canadian distributors. The tobacco was then shipped from Canada to locations in Western New York. Certain defendants, according to the government, then transported the tobacco to warehouses operated by other defendants on the Reservation. The government alleges that defendants crafted fictitious invoices to conceal the delivery of the tobacco to the Reservation.

Upon reaching the Reservation, the government claims that defendants surreptitiously transported the tobacco by boat or sled from the Reservation into Canada, avoiding Canadian customs. The government charges that defendants employed codes and counter-surveillance throughout the smuggling scheme to avoid detection. The government further claims that defendants made international and interstate tele-

phone calls and facsimile transmissions to advance the smuggling operation. Ultimately, according to the government, defendants resold the tobacco products on the "black market" in Montreal, Toronto, and other Canadian cities.[2]

According to the government, Reports of Financial Transactions Exceeding $10,000 in the Course Of A Trade or Business (8300 forms) were neither prepared nor filed in connection with the scheme, preventing the Internal Revenue Service (IRS) from assessing or collecting taxes. The government also asserts that neither Currency Transaction Reports (CTRs) nor Reports of Currency or Monetary Instruments in Excess of $10,000 Crossing the Border (CMIRs) were prepared or filed.

Furthermore, the government contends that the smuggling scheme generated huge profits in Canadian currency, necessitating defendants to devise an illegal currency exchange/money laundering operation. Specifically, the Canadian currency is alleged to have been exchanged and/or deposited to purchase bank drafts or wire transfers, which were then used to pay for additional products, thereby promoting the smuggling operation.

### B. The Superseding Indictment

The above-described allegations form the basis for the seven-count superseding indictment (the "indictment").

Counts one, four and six charge dual-object conspiracies violating 18 U.S.C. § 371. They are based upon the alleged agreement to (1) aid and abet those engaged in the outbound smuggling of tobacco and liquor products, see 18 U.S.C. § 546; and (2) conduct the underlying transactions without preparing the required forms, and recording or reporting the underlying transactions.

Counts two, three and five charge money-laundering conspiracies violating 18 U.S.C. § 1956(a)(1)(A) and (h). They are based upon the alleged money-laundering agreement and smuggling operation.

---

**2.** The government alleges that defendants smuggled liquor products from the United States to Canada through the Reservation in the same manner.

Count seven is a racketeering count charging defendants L. David Jacobs and Anthony Laughing with extortion, bribery, and the operation of an illegal gaming business. *See* 18 U.S.C. § 1955(a), 1961(1)(4) & (5), 1962(c); N.Y. PENAL LAW § 155.05(2)(e)(viii), 200.10, 225.30(1–3).

Lastly, the indictment alleges forfeiture of cash and property, including: (i) $557,677,994.63 in cash representing the amount laundered as charged in Count two; (ii) $79,672,469.62 in cash representing the amount laundered as charged in Count three; (iii) $50,103,128.97 in cash representing the amount laundered as charged in Count five; (iv) $185,000.00 in cash representing proceeds obtained from the racketeering activity charged in Count seven; and (v) assorted real and personal property of defendants.

## II. DISCUSSION

Presently before the Court are motions by defendants seeking the following relief: (1) an order striking surplusage from the indictment; (2) dismissal of the indictment; and (3) the return of seized property. The Court will address defendants' motions *seriatim.*

### A. Surplusage

Defendants move to strike various words and paragraphs in the indictment as improper and prejudicial surplusage.

"The court on motion of the defendant may strike surplusage from the indictment or information." FED. R. CRIM. P. 7(d). The purpose of Rule 7(d) is to protect the defendant against prejudicial allegations of irrelevant facts. The decision to strike, however, is within the discretion of the trial court. *U.S. v. Courtney,* 257 F.2d 944, 947 (2d Cir.1958), *cert. denied,* 358 U.S. 929, 79 S.Ct. 316, 3 L.Ed.2d 303 (1959). Motions to strike will be granted only when the challenged allegations are "not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (internal quotations omitted). "This is a rather exacting standard, and only rarely has surplusage been ordered stricken." 1 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2D § 127, at 426–27 (1982).

The test is not simply whether the words in the indictment are prejudicial; rather, to warrant their removal the language must be irrelevant to the crime charged. *See United States v. DePalma,* 461 F.Supp. 778, 797 n. 26 (S.D.N.Y.1978). " 'If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.' " *Scarpa,* 913 F.2d at 1013 (quoting *DePalma,* 461 F.Supp. at 797).

In the present case, defendants challenge a number of phrases. First, they move to strike paragraph two of the preamble of the indictment, which states:

During the late 1980s and early 1990s, there were numerous confrontations between members of the New York State Police and armed members of a paramilitary group known as the "Warriors Society."

According to defendants, this paragraph is both irrelevant and highly inflammatory. The government counters that it informs of the unique characteristics of the Reservation, which was essential to the smuggling scheme's creation and success.

Defendants' argument is more persuasive; there is no relevancy between the alleged commercial smuggling of cigarettes and tobacco and the "numerous confrontations" between a "paramilitary group" and law enforcement. The paragraph also is highly prejudicial; it improperly implies defendants involvement in uncharged acts of violence. *See United States v. Gatto,* 746 F.Supp. 432, 458 (D.N.J.1990) ("The preamble should not contain information beyond what is alleged in the counts, nor should it contain terminology that carries with it connotations of culpable behavior."), *rev'd on other grounds,* 924 F.2d 491 (3d Cir.1991); *United States v. Hubbard,* 474 F.Supp. 64, 83 (D.D.C.1979) (striking from indictment uncharged reference to confrontation between Federal Bureau of Investigation and alleged members of Church of Scientology); *see also United States v. Abel,* 258 F.2d 485, 501 (2d Cir.1958), *aff'd,* 362

U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Accordingly, paragraph two is stricken from the indictment.

■ Second, defendants challenge as surplusage paragraph five of the preamble of the indictment, which provides:

This smuggling activity was well known within the community and has been the subject of newspaper articles, magazine articles, and television broadcasts.

Defendants argue that this paragraph is unnecessary to the proof of any material element of the crimes charged.

As noted by the government, however, this paragraph is relevant to the issue of defendants' intent. Specifically, it provides circumstantial evidence that defendants knew their related activities were part of an unlawful smuggling scheme and that the alleged currency they used to conduct their financial transactions were the proceeds of the scheme.[3] Thus, paragraph five of the preamble stands.

■ Lastly, defendants challenge the words "[t]he original," "[t]he Lewis and Robert Tavano," and "[t]he Pine Partnership" in the captions of Counts one, four and five of the indictment, respectively. Defendants argue that not only are these labels unnecessary to prove any the charged crimes, but the jury may view them as more culpable as a consequence.

These descriptive titles, however, merely mirror the proof that the government asserts it will present at trial—namely, that the conspiracy charged in Count one is in fact the "original" conspiracy, that the conspiracy charged in Count four was led by Lewis and Robert Tavano, and that the conspiracy charged in Count five revolved around the activities of the Pine Partnership. "Courts have consistently refused to strike language in indictments that identified the name of the criminal enterprise ...." *United States v. Elson*, 968 F.Supp. 900, 909 (S.D.N.Y.1997); *see also United States v. Vastola*, 899 F.2d 211, 232 (3rd Cir.1990), *vacated on other grounds*, 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990). Any concern of prejudice arising from the labels can be cured by a cautionary instruction to the jury not to consider either the name or order of the conspiracies as evidence of any defendant's guilt. *See Vastola*, 899 F.2d at 232. Therefore, these phrases stand.

### B. Dismissal of the Indictment

#### 1. Counts One, Four and Six

A number of defendants seek dismissal of Counts one, four and six of the indictment on various grounds.

Counts one, four and six allege that defendants participated in three interrelated dual-object conspiracies, each in violation of 18 U.S.C. § 371.[4] The first object of the conspiracies, according to the indictment, was to aid and abet outbound smuggling, in violation of 18 U.S.C. § 546.[5] The second object

**3.** Defendants also challenge the admissibility of the media reports as hearsay evidence. To the extent that the media reports contain admissions by defendants, they are admissible pursuant to FED. R. EVID. 801(d)(2). They also are admissible for the limited purpose of showing intent and notice, see *United States v. Mills*, 987 F.2d 1311, 1314 (8th Cir.), *cert. denied*, 510 U.S. 953, 114 S.Ct. 403, 126 L.Ed.2d 351 (1993), but not for the truth of the matter asserted. *See generally* FED. R. EVID. 801(c) (defining hearsay as "a statement ... offered in evidence to prove the truth of the matter asserted").

**4.** Section 371 provides, in pertinent part:
If two or more persons conspire either to commit offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned not more than five years, or both.
18 U.S.C. § 371 (Supp.1998).

**5.** Section 546 provides, in pertinent part:
Any person owning in whole or in part any vessel of the United States who employs, or participates in, or allows the employment of, such vessel for the purpose of smuggling, or attempting to smuggle, or assisting in smuggling, any merchandise into the territory of any foreign government in violation of the laws there in force, if under the laws of such foreign government any penalty of forfeiture is provided for violation of the laws of the United States respecting the customs revenue, ... shall be fined or imprisoned not more than two years, or both.
18 U.S.C. § 546 (Supp.1998).

of the conspiracies, according to the indictment, was to defraud the U.S. and its agencies, specifically (i) the Bureau of Alcohol, Tobacco and Firearms (ATF) in the regulation of liquor transactions; (ii) the Internal Revenue Service (IRS) in the assessment and collection of taxes and revenue; and (iii) the United States Customs Service and IRS, in collecting data and recording currency transactions in amounts exceeding $10,000 for the purpose of investigating violations of the criminal laws.

The Court now turns to the various dismissal motions of defendants with respect to Counts one, four and six.

### a. Multiplicity

Defendants Robert and Lewis Tavanos and Larry and Dana Leigh Thompson contend that Counts one and four of the indictment are multiplicitous.

■ A multiplicitous indictment "charges in separate counts two or more crimes, when in fact and law, only one crime has been committed." *United States v. Holmes,* 44 F.3d 1150, 1153–54 (2d Cir.1995); *United States v. Maldonado–Rivera,* 922 F.2d 934, 969 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). "The doctrine of multiplicity 'is based upon the double jeopardy clause of the Fifth Amendment, which assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *United States v. Harris,* 79 F.3d 223, 231 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 142, 136 L.Ed.2d 89 (1996) (quoting *United States v. Fiore,* 821 F.2d 127, 130 (2d Cir.1987)).

■ To determine whether multiple conspiracy counts alleged in an indictment are, in fact, a single conspiracy, the Court must examine the "totality of the circumstances." *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985); *United States v. Urlacher,* 784 F.Supp. 61, 64 n. 1 (W.D.N.Y.1992), *aff'd,* 979 F.2d 935 (2d Cir.1992). This requires consideration of a variety of factors, which together aid in determining whether the conspiracies are individuated. *See Korfant,* 771 F.2d at 662. " '[O]nce a defendant introduces sufficient evidence that the two conspiracies alleged were in fact one, the burden shifts to the government to rebut the inference of unity.'" *United States v. Abbamonte,* 759 F.2d 1065, 1069 (2d Cir.1985) (quoting *United States v. Papa,* 533 F.2d 815, 820–23 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976)).

As evidence of multiplicity, defendants point to the following: Counts one and four share a violation of the same federal criminal statute, 18 U.S.C. § 371; all the conspirators alleged in Count four are alleged to have been members of the conspiracy charged in Count one; there is substantial overlap in time between the alleged conspiracies; the alleged conspiracies operated in largely the same manner; the overt acts alleged to support the conspiracies are largely the same; the geographic location of the alleged conspiracies are substantially the same; and both conspiracies allege the same objects of the conspiracy.

The government, in turn, contends that defendants engaged in two separate, but related, conspiracies. Count one, according to the government, alleges defendants' participation in a conspiracy to defraud the United States that involved Larry Miller. By contrast, Count four, according to the government, alleges a separate conspiracy that existed simultaneously with and after the conspiracy charged in Count one. The government also maintains that the multiplicity claim is not ripe, arguing that the Court should have the benefit of hearing the evidence before determining whether the counts are multiplicitous.

■ The threshold issue is thus a timing one: whether defendants multiplicity claim should be addressed pre-trial or after the presentation of evidence.

■ On the one hand, if an indictment is multiplicitous on its face, then the multiplicitous count(s) should be dismissed pre-trial. *See United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981). On the other hand, "[w]hether an aggregate of acts constitute a single course of conduct and therefore a single offense, or more than one, may not be capable of ascertainment merely from the bare allegations of an information and may have to

await the trial on the facts." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 224, 73 S.Ct. 227, 97 L.Ed. 260 (1952) (*"Universal"*); *see also United States v. Walker*, 524 F.Supp. 1029, 1030 (E.D.Pa. 1981) (concluding that multiplicity claim not ripe at pre-trial stage because of lack of developed record); *United States v. Stofsky*, 409 F.Supp. 609, 617–18 (S.D.N.Y.1973) (discussing ripeness concerns).

The multiplicity issue in this case is not ripe. First, the indictment is not multiplicitous on its face. Count one alleges a conspiracy involving Larry Miller. Count four, by contrast, alleges a separate conspiracy that existed during and after the conspiracy charged in Count one.

Second, the Court has before it no evidence regarding the alleged § 371 conspiracies. Defendants' speculation of what the evidence will be is unconvincing. Based upon the current record, an intelligent review of the multiplicity issue cannot be made. *See Universal*, 344 U.S. at 224, 73 S.Ct. 227; *Stofsky*, 409 F.Supp. at 617–18; *Walker*, 524 F.Supp. at 1030. The importance of having a fully-developed record here is critical for two reasons: first, and more generally, an evaluation of various factors is a fact-intensive inquiry; and second, and more specifically, this case is a complex one.

Although additional evidence concerning the alleged § 371 conspiracies may result in a finding that the counts are multiplicitous, that determination cannot now be made. If the defendants introduce sufficient evidence at trial that the separate conspiracies alleged were, in fact, one, then the government will be ordered to "elect among the multiplicitous counts, with all but the one elected dismissed." *See Reed*, 639 F.2d at 904 n. 6; *United States v. Ketchum*, 320 F.2d 3, 7–8 (2d Cir.), *cert. denied*, 375 U.S. 905, 84 S.Ct. 194, 11 L.Ed.2d 145 (1963).

Defendants' concerns that the mere making of multiple conspiracy charges may have some psychological effect upon the jury, see *Reed*, 639 F.2d at 904 (recognizing that prolix pleading may prejudice the jury "by suggesting that a defendant has committed not one but several crimes"), must yield here to the countervailing considerations of ripeness. A curative instruction can help remove any potential for prejudice stemming from the jury's awareness of the multi-charge indictment. *See United States v. Cervone*, 1988 WL 155641, at *9 (E.D.N.Y. May 18, 1988), *aff'd*, 907 F.2d 332 (1990).

Accordingly, defendants' motions to dismiss Counts one or four based on multiplicity grounds are denied without prejudice to renew the motions after the close of the government's case or after the close of the entire case. *See* FED. R. CRIM P. 29.

### b. Duplicity

■ Larry Thompson and Dana Leigh Thompson next move to dismiss Counts one, two and four as duplicitous, arguing that each count charges more than one conspiracy.

■ "An indictment is duplicitous if it joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir.1992) (citing *United States v. Murray*, 618 F.2d 892, 896 (2d Cir.1980)). The policy reasons against duplicitous indictments "include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution." *Aracri*, 968 F.2d at 1518 (citations omitted). An indictment, therefore, may not charge multiple conspiracies in a single count. *Id.* A single conspiracy, however, may have multiple objects because the single conspiracy is the crime, not its diverse objects. *Id.*; *United States v. Ballistrea*, 101 F.3d 827, 835 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1327, 137 L.Ed.2d 488 (1997).

In this case, defendants do not take issue—as they cannot—with each of Counts one and four charging a dual-object conspiracy. They contend, instead, that each count fails to allege a single conspiracy among the defendants who operated the warehouses on the Reservation. Defendants' argument runs that to charge a single conspiracy in

each count, there must be an allegation in each count that the warehouse and facility operators acted interdependently. According to defendants, because there is no allegation of interdependence among the warehouse operators, each count actually alleges a number of smaller—and thus duplicitous—chain conspiracies.

After reviewing Count one of the indictment, it is evident that the essence of this Count is a single conspiracy both to engage in the outbound smuggling of tobacco and liquor products and to defraud the U.S. and its government agencies. Count one alleges a series of overt acts taken by the defendants in furtherance of the charged single conspiracy; it is not duplicitous on its face. *See Aracri*, 968 F.2d at 1518–19; *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir.1989) ("[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme"), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). Neither are Counts two or four duplicitous. *See Aracri*, 968 F.2d at 1518–19. Rather, like Count one, the bedrock of those counts is a series of overt acts in support of their respective single conspiracy charges.

■ Whether the proof at trial establishes a single conspiracy or multiple conspiracies is a question of fact for a properly instructed jury. *See, e.g., id.* The Court recognizes that a "multiple conspiracy charge" is appropriate here, and will instruct the jury that they must acquit each defendant unless they find him guilty of the conspiracy charged in the indictment. *Id.* at 1519.

Accordingly, defendants Larry and Dana Leigh Thompson's motion to dismiss Counts one, two and four on duplicity grounds is denied.

### c. 18 U.S.C. § 546

Defendants next seek dismissal of the alleged violation of 18 U.S.C. § 546 as an object of the section 371 conspiracies charged in Counts one, four and six. They assert that: (1) the indictment is defective because it does not allege a material element of the charged section 546 violation; (2) the government cannot allege a reciprocal Canadian statute as required under section 546; and (3) section 546 is unconstitutionally vague as applied to the defendants' conduct.

Section 546, which generally prohibits the smuggling of goods into foreign countries, provides, in pertinent part, as follows:

> Any person owning in whole or in part any vessel of the United States who employs, or participates in, or allows the employment of, such vessel for the purpose of smuggling, or attempting to smuggle, or assisting in smuggling, any merchandise into the territory of any foreign government in violation of the laws there in force, *if under the laws of such foreign government any penalty of forfeiture is provided for violation of the laws of the United States respecting the customs revenue,* ... shall be fined or imprisoned not more than two years, or both.

18 U.S.C. § 546 (emphasis supplied). Section 546 contains a reciprocity element: the government must show that the foreign country into which defendants have smuggled, attempted to smuggle, or assisted in smuggling, any merchandise, makes it a "penalty or forfeiture" for a violation there of the laws of the United States respecting customs revenue.

Defendants attack the sufficiency of the indictment on the ground that it does not allege a reciprocal Canadian law that penalizes individuals in Canada for smuggling goods into the United States without paying United States customs duties. They also posit that the government's filing of a bill of particulars, which expresses the government's intention to rely upon Section 465(3) of the Canadian Criminal Code, does not remedy the violation of the defendants' Fifth and Sixth Amendment's rights to a proper indictment by the grand jury.

Defendants' argument presents the question whether an indictment that charges a dual-object conspiracy is required to allege the material elements of each of the underlying object offenses.

■ It is firmly established that "[c]onvictions are no longer reversed because of

minor and technical deficiencies which did not prejudice the accused." *See, e.g., Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) (citations omitted). Instead, "[i]ndictments are now reviewed for constitutional infirmities, most notably whether the alleged defect offends the Sixth Amendment right of the accused to be informed of the charges against him, [or] the Fifth Amendment right not to be prosecuted without indictment by a grand jury." *United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir.1995) (citations omitted). The Second Circuit has " 'consistently sustained indictments which tracked the language the statute and, in addition, do little more than state time and place in approximate terms.' " *United States v. Trotta,* 525 F.2d 1096, 1098–99 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976) (quoting *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974)). Furthermore, a conspiracy indictment need not contain the same level of specificity and detail of an indictment alleging a substantive offense. *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927).

In the seminal case of *Wong Tai,* the Supreme Court stated: "[i]t is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." 273 U.S. at 81, 47 S.Ct. 300. "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed. The indictment need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense, or . . . apprise the grand jury in essential terms of

the object of the conspiracy." *Wydermyer,* 51 F.3d at 325.

■ The instant conspiracy indictment satisfies these standards. It charges defendants, in pertinent part, with knowingly and intentionally conspiring "to aid and abet individuals who own in whole or in part a vessel of the United States, and who employ, and participate in the employment of such vessel for the purposes of smuggling, and attempting to smuggle, and assisting in smuggling, tobacco and liquor into the territory of Canada, in violation of the laws there in force, in violation of [18 U.S.C. § 546]." *See* indictment at 4–5. The indictment also alleges a series of overt acts committed by defendants in furtherance of the conspiracy. *Id.* In short, the indictment both "tracks" the statutory language and adequately informs the defendants of the charges against them. *See Trotta,* 525 F.2d at 1098–99. Taken as a whole, it sufficiently informed the grand jury of the object offense. The indictment need not allege all the elements of the predicate offense—that is, a reciprocal Canadian statute. *See United States v. Werme,* 939 F.2d 108, 112 (3d Cir.1991) ("An indictment charging a conspiracy under 18 U.S.C. § 371 need not specifically plead all of the elements of the underlying substantive offense."), *cert. denied,* 502 U.S. 1092, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992).

■ Defendants next argue that even assuming the indictment is not defective, the § 546 predicate offense must be dismissed because there does not exist, as a matter of law, a reciprocal Canadian statute that can trigger its application.

As noted, for § 546 to apply, the government must establish that Canada makes it a "penalty or forfeiture" for a violation there of the laws of the United States respecting customs revenue. The government relies upon section 465(3) of the Canadian Criminal Code.[6] *See* Government's Bill of Particulars

---

6. Section 465(3) provides as follows:

(3) Every one who, while in Canada, conspires with any one to do anything referred to in subsection (1) in a place outside Canada that is an offense under the laws of that place shall be deemed to have conspired to do that thing in Canada.

Subsection (1), in turn, provides that:

(1) Except where otherwise expressly provided by law, the following provisions apply in respect of conspiracy:

(a) every one who conspires to commit murder or to cause another person to be murdered, whether in Canada or not, is guilty of an indictable offence and liable to a maximum term of imprisonment for life;

at 1. Section 465(3) provides that a conspiracy in Canada to do anything described in § 465(1) outside Canada that is an offense in such place is a conspiracy to do that thing in Canada. However, § 465(3) is self-limiting; it only applies when the object of the conspiracy is an offense both in Canada and in the country where the offense is to occur. *See Bolduc v. Attorney–General of Ouebec et al.*, 68 C.C.C.(2d) 413, 418 (S.Ct. of Canada 1982).

In *Bolduc*, the Canadian government prosecuted a French Canadian under the predecessor statute of section 465(3),[7] asserting that the defendant had conspired to transport people into the United States in violation of U.S. immigration law. Defendant argued against application section 465(3). The Canadian Supreme Court made two critical points: first, for section 465(3) to apply, the object of the conspiracy must be an offense "both in Canada and in the country where the conspirators intend to carry it out"; and second, "[t]he identity of offences must be understood as identity of their essential elements, so that the act, if committed in Canada, would constitute an offence in Canada." *Id.* at 418–19. The *Bolduc* court held that, because the object of the offense—to effect an illegal entry—was a crime in both the United States and Canada, defendants could be prosecuted for conspiracy under section 465(3). *Id.* at 420.

Applying both section 465(3) and the teachings of *Bolduc* here, it is plain that Canadian Criminal Code section 465(3) does not satisfy the reciprocity requirement of 18 U.S.C. § 546. For section 465(3) to punish outbound smuggling from the United States, Canada must make outbound smuggling from Canada an offense under Canadian law. As the government cites to no Canadian law that

punishes outbound smuggling, it cannot rely on section 465(3) to satisfy reciprocity under 18 U.S.C. § 546.

Accordingly, Counts one, four and six are dismissed insofar as each alleges a conspiracy to violate 18 U.S.C. § 546.

### 2. Counts Two, Three and Five of the Indictment

Counts two, three and five of the indictment charge conspiracies violating 18 U.S.C. § 1956(a)(1)(A) and (h). They are based on the alleged money laundering agreement and smuggling operation. Specifically, the government alleges that the smuggling operation generated huge amounts of profits in Canadian currency. The Canadian currency, in turn, is alleged to have necessitated a currency exchange/money laundering operation. That is, Canadian currency generated from the alleged illegal-tax-free sale of tobacco and liquor products on the Canadian black market had to be exchanged and/or deposited to purchase bank drafts or wire transfers, which were used to pay for additional goods, thereby promoting the smuggling operation. The agreement to conduct these financial transactions is the essence of the money-laundering conspiracies.

The money-laundering conspiracy statute, 18 U.S.C. § 1956(h), provides as follows:

> Any person who conspires to commit any offense defined in this section ... shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

Here, the government charges as the object offense 18 U.S.C. § 1956(a)(1)(A)(i), which provides that:

> (a)(1) Whoever, knowing that the property involved in a financial transaction repre-

---

(b) every one who conspires with any one to prosecute a person for an alleged offense, knowing that he did not commit that offence, is guilty of an indictable offence and liable

. . .

(c) every one who conspires with any one to commit an indictable offence not provided for in paragraph (a) or (b) is guilty of an indictable offence and liable to the same punishment as that to which an accused who is guilty of that offence would, on conviction, be liable; and

(d) every one who conspires with any one to commit an offence punishable on summary conviction is guilty of an offence punishable on summary conviction.

7. Section 465(3) mirrors its predecessor statute, § 423(3), which provided that:

Every one who, while in Canada, conspires with any one to do anything referred in subsection (1) or (2) in a place outside Canada that is an offence under the laws of that place shall be deemed to have conspired to do in Canada that thing.

sents the *proceeds* of a *specified unlawful activity*, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity

. . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

(emphasis added). Section 1956(c)(7) defines "specified unlawful activity" as any offense listed in that subsection or in 18 U.S.C. § 1961(1). 18 U.S.C. § 1956(c)(7). Here, the government charges wire fraud under 18 U.S.C. § 1343 as the "specified unlawful activity." Wire fraud is considered a "specified unlawful activity." *See* 18 U.S.C. § 1961(1). The term "proceeds" is not defined by statute.

Defendants advance four principal arguments for dismissal of the money-laundering conspiracy counts: (1) Indian sovereignty; (2) the Jay Treaty; (3) failure by the government to alleged a legally cognizable claim of money laundering; and (4) the revenue rule.

### a. Indian Sovereignty

Defendants challenge the exercise of federal criminal jurisdiction with sweeping assertions of Indian sovereignty.

"Although physically within the territory of the United States and subject to ultimate federal control, [Indian country such as the Reservation] nonetheless remain 'a separate people, with the power of regulating their internal and social relations.'" *United States v. Wheeler*, 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (quoting *United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 30 L.Ed. 228 (1886)); *United States v. Cook*, 922 F.2d 1026, 1030–31 (2d Cir.1991). However, "[t]heir incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised." *Wheeler*, 435 U.S. at 323, 98 S.Ct. 1079. "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. . . . In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Id.*

■■■■■■ Generally, absent some federal jurisdictional hook, there is no federal criminal jurisdiction over Indians in Indian country.[8] *See* 18 U.S.C. §§ 1152[9] and 1153;[10] *United States v. Markiewicz*, 978 F.2d 786, 797 (2d Cir.1992). The three basic hooks for federal criminal jurisdiction are: (1) the Federal Enclave Act ("FEA"), 18 U.S.C. § 1152; (2) the Major Crimes Act ("MCA"), 18 U.S.C. § 1153; and (3) "peculiarly Federal crimes . . . the prosecution of [which] . . . would protect an independent federal interest." *Markiewicz*, 978 F.2d at 799–800; *see also*

---

**8.** The term "Indian country" is defined as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

**9.** Section 1152 provides:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country. This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulation, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152.

**10.** Section 1153 conferred federal court jurisdiction over enumerated Indian–against–Indian "major" offenses committed on Indian territory. *See* 18 U.S.C. § 1153.

*Wheeler,* 435 U.S. at 331 nn. 30 & 32, 98 S.Ct. 1079.

In this case, defendants assert that federal criminal jurisdiction does not extend to the charge of money-laundering conspiracy because it is neither an enumerated crime under the FEA nor the MCA, and the government has not demonstrated that it is a peculiar federal crime the prosecution of which would protect an independent federal interest.

■■■ Defendants' argument, however, overlooks several lynchpins to successful claims of Indian sovereignty. First, for jurisdiction to be at issue, it is axiomatic that the offense must have been committed by an Indian. *See* 18 U.S.C. § 1152. Here, the non-Indian defendants cannot assert that the Court lacks federal criminal jurisdiction based upon the sovereignty rights of the members of the Reservation. *Id.*

■■■ Second, the issue of federal criminal jurisdiction arises only when the offense occurred within Indian country. *See* 18 U.S.C. § 1152; *Markiewicz,* 978 F.2d at 797, 801 (citations omitted). Here, defendants ignore that each of the money-laundering conspiracy counts charge them with participating in financial transactions that involved property constituting the proceeds of specified unlawful activity (i.e., wire fraud). Specifically, the indictment alleges that the products were transported from the Reservation into Canada and then sold on the black market. It also charges that defendants made numerous interstate and international phone calls and that they conducted financial transactions at banks located in the State of New York involving property constituting the proceeds of the wire fraud scheme. Thus, to the extent the offenses occurred outside the Reservation, defendants cannot claim that the Court lacks jurisdiction over the charged money-laundering conspiracies. *See Markiewicz,* 978 F.2d at 801–02.

■■■ Third, even to the extent that Reservation sovereignty is properly before us, it must give way to federal interests in preventing money laundering involving a scheme to defraud the United States. *See Markiewicz,* 978 F.2d at 799 (recognizing that "there is

federal jurisdiction when the offense is one such as ... defrauding the *United States* " even when offense is intra-Indian on Indian country that is not enumerated under 18 U.S.C. § 1153) (emphasis added); *United States v. Wadena,* 152 F.3d 831, 841–42 (8th Cir.1998); *see also Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960) ("[I]t is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests"). Contrary to defendants' suggestion, the indictment does not serve solely to advance Canadian interests. The government charges that defendants defrauded and impeded the operation of agencies of the United States, specifically: (i) the IRS in the assessment and collection of taxes and revenue; and (ii) the United States Customs Service and IRS, in collecting data and recording currency transactions in amounts exceeding $10,000 for the purpose of investigating violations of the criminal laws. A strong federal interest also is present in preserving the integrity of our telecommunications and banking industries by preventing them from becoming the instrumentalities for criminal activity both here and abroad. Other federal interests include preventing the Reservation from becoming a haven for smugglers and ensuring the public safety within and without the Reservation.

Thus, federal criminal jurisdiction is present over all defendants.

#### b. The Jay Treaty

Defendants next assert that the indictment constitutes an unlawful abridgment of their rights under Article III of the Treaty of Amity, Commerce and Navigation, 8 Stat. 116, 118 (1974) (commonly known as the "Jay Treaty"). This argument need not detain us long.

The Jay Treaty provides, in relevant part:

[n]or shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any impost or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians.

8 Stat. 18. In *Akins v. United States,* 64 C.C.P.A. 68, 551 F.2d 1222, 1229–30 (C.C.P.A.1977), the court thoroughly traced the duty exemption through several hundred years of case law, statutes, and historical events. The *Akins* court concluded that both the War of 1812 and the Tariff Act of 1897 abrogated the personal duty exemption of Article III of the Jay Treaty. 551 F.2d at 1229–30; *see also United States v. Boots,* 80 F.3d 580, 585 n. 7 (1st Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 273, 136 L.Ed.2d 188 (1996). *See generally Karnuth v. United States ex rel. Albro,* 279 U.S. 231, 239, 49 S.Ct. 274, 73 L.Ed. 677, (1929).

Accordingly, this Court will not "revive the duty exemption which history and the law have firmly ended." *See Akins,* 551 F.2d at 1230.

#### c. Proceeds

■ Defendants next contend that the government has not alleged a legally cognizable theory of money laundering conspiracy because the charged specified unlawful activity—the wire fraud scheme to defraud the U.S. and Canadian governments of tax revenue—did not generate any "proceeds." *See* 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h). Specifically, defendants assert that the purpose and result of the alleged wire fraud scheme of tax evasion was not to generate proceeds (or "dirty" laundered money) from the sale of liquor and tobacco, but rather, avoiding the payment of "clean money" to the United States and Canadian governments. They correctly note that tax evasion is conspicuously absent from the enumerated list of specified unlawful activities. *See* 18 U.S.C. § 1956(a)(1)(A); 1956(c)(7). In short, they accuse the government of creative charging; that is, attempting to do through the back door of the wire fraud statute what it is precluded from doing through the front door.

Although defendants' argument is not without some attraction, it is in the end unpersuasive. Admittedly, there is some tension, illustrated by this prosecution, between Congress' decision to include the mail and wire statute [11] as a specified unlawful activity and to exclude tax evasion.

The Second Circuit, in *United States v. Eisen,* 974 F.2d 246, 253–54 (2d Cir.1992), *cert. denied,* 507 U.S. 1029, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993), confronted an analogous situation under the Racketeer Influenced and Corrupt Organizations Act (RICO). In that case, defendant contended that allowing mail fraud based upon perjury to serve as the predicate RICO offense conflicted with Congress' intent in omitting perjury as an enumerated RICO predicate offense. In rejecting defendant's assertion, the court held that "where, as here, a fraudulent scheme falls within the scope of the federal mail fraud statute and the other elements of RICO are established, use of the mail fraud offense as a RICO predicate act cannot be suspended simply because perjury is part of the means for perpetrating the fraud." *Id.* The court emphasized that it was not the act of perjury alone that brought it within the purview of RICO.

This reasoning applies equally to our case, as it is not tax evasion alone that brings the alleged conduct of defendants within the chargeable scope of money laundering; rather, it is the alleged fraudulent scheme that falls within the scope of the wire fraud statute and the other elements of the money laundering statute.

Defendants also overlook the great weight of precedent permitting the use of the mail and wire fraud statute to reach wire fraud schemes whose aim is the evasion of federal and state taxes. *United States v. Dale,* 991 F.2d 819, 849 (D.C.Cir.) (federal tax revenues), *cert. denied,* 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993); *United States v. Helmsley,* 941 F.2d 71, 93–95 (2d Cir.1991) (state income taxes), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992);

---

11.  The wire fraud statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1343.

*United States v. Bucey,* 876 F.2d 1297, 1309–10 (7th Cir.) (federal income taxes), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989); *United States v. DeFiore,* 720 F.2d 757, 761 (2d Cir.1983) (federal and state taxes), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). *But see United States v. Henderson,* 386 F.Supp. 1048, 1052–54 (S.D.N.Y.1974). It is of no moment "whether the scheme [to defraud] seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments." *United States v. Trapilo,* 130 F.3d 547, 552 (2d Cir.1997).

Furthermore, defendants' assertion of no proceeds lacks logical force as a factual matter. Countless Canadian customers are alleged to have purchased the defendants' tax-free tobacco and liquor with Canadian currency, which defendants converted into U.S. currency via bank transfers, thereby promoting the wire fraud scheme. Thus, the black market sales generated the "dirty money" or "proceeds" that formed the basis for the financial transactions promoting the scheme. *See United States v. Trapilo,* 130 F.3d 547, 549 n. 3 (2d Cir.1997) (recognizing that "the act of smuggling ... is an act within the meaning of a 'scheme to defraud' ").

Lastly, defendants' belief that a tax evasion crime can never generate proceeds under the money laundering statute is inconsistent with the other sections of the statute. Congress defined "specified unlawful activity" to include the offenses of 18 U.S.C. §§ 542 and 545, which, respectively, criminalize the making of false statements in connection with imported merchandise and the smuggling of goods into the United States. Both have as their goal tax avoidance. Thus, the money laundering statute itself enumerates other specified unlawful activities that have the effect of tax avoidance.

Accordingly, the Court finds that the government has alleged a legally cognizable claim of money-laundering conspiracy against defendants.

#### d. The Revenue Rule

■ Lastly, defendants argue that even if the wire fraud scheme generated "proceeds," the charges fail because the wire fraud scheme does not reach the defendants here.

Defendants rely on the First Circuit case of *Boots,* 80 F.3d at 580. *Boots* is a case very much like ours. As here, the defendants in *Boots* were charged with smuggling tobacco and liquor products into Canada via the Reservation. The First Circuit held that defendants could not be prosecuted under the mail and wire fraud act because such a scheme to defraud the foreign government of tax revenues is outside the parameters of frauds cognizable under the mail and wire fraud statute. This finding rested largely on the revenue rule, which generally provides that courts will not enforce foreign tax judgments. The First Circuit reasoned that because, at heart, the smuggling scheme was designed to avoid the payment of Canadian taxes, upholding the defendants' convictions would amount functionally to penal enforcement of Canadian customs and tax laws. The First Circuit noted that to convict, our courts would be required to pass on whether a violation of Canadian tax laws was intended and occurred. Accordingly, the First Circuit reversed defendants' convictions under the mail and wire fraud act.

The Second Circuit, however, rejected the reasoning of *Boots* in *United States v. Trapilo,* 130 F.3d 547 (2d Cir.1997). *Trapilo,* like here, involved the alleged smuggling of liquor and tobacco products across the Reservation into Canada. The one-count indictment charged a money-laundering conspiracy under 18 U.S.C. § 1956(h). In rejecting the district court's dismissal of the indictment in reliance upon *Boots, Trapilo* reasoned that the mail and wire fraud statute condemns the intent to defraud, which "does not hinge on whether or not the defendants were successful in violating Canadian tax revenue laws." *Id.* at 552–53. Consequently, it found that there was no obligation to pass on the validity of Canadian revenue law and the common law revenue rule.

*Trapilo* has foreclosed the defendants' argument regarding the revenue rule. Defendants attempt to distinguish *Trapilo* on the ground that this prosecution charges § 546 offenses, thus further entangling the Court in Canada's tax laws beyond the *Trapilo* context, is unavailing in light of the dismissal of the section 546 charges.

### 3. Asset Forfeiture

#### a. John Fountain

█ Defendant John Fountain seeks the pretrial release of "substitute assets" seized by the government pursuant to warrants signed by the Magistrate Judge. Fountain contends that (1) 18 U.S.C. § 982(b)(1)(A) does not permit the pretrial restraint of substitute asserts, and (2) the assets he seeks to have released are not owned by him, but rather by non-defendant third parties.

In the case of a person convicted of a money laundering offense, 18 U.S.C. § 982(a)(1) mandates the criminal forfeiture of any property that is "involved in" or "traceable to" to such offense. The proceedings relating to property forfeited under § 982(a)(1) are governed by 21 U.S.C. §§ 853(c) and (e) through (p). 18 U.S.C. S 982(b)(1)(A).

In arguing that the pre-trial seizure of "substitute assets" [12] is permitted, the government relies upon 853(f), which provides, in pertinent part:

[I]f the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this subsection may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

21 U.S.C. § 853(f).

The question of pretrial restraint of "substitute assets" is a difficult one. The majority view, embraced by the Third, Fifth, Eight and Ninth Circuits, is that the pretrial restraint of substitute assets is impermissible. *See United States v. Field*, 62 F.3d 246, 249 (8th Cir.1995); *United States v. Ripinsky*, 20 F.3d 359 (9th Cir.1994); *United States v. Floyd*, 992 F.2d 498, 501–02 (5th Cir.1993). *Accord In re Assets of Martin*, 1 F.3d 1351, 1358–59 (3d Cir.1993) (finding that substitute assets not subject to pretrial restraint under nearly identical RICO forfeiture provision, 18 U.S.C. § 1963). Each of these decisions has found dispositive the unambiguous statutory language, which specifically limits pretrial restraint to property involved in or traceable to the crime. *See, e.g., Ripinsky*, 20 F.3d at 363 (stating that while § 853 commands a liberal construction, "it does not authorize us to amend by interpretation") (quotations omitted).

The minority view, adopted by the Fourth Circuit and various district courts, recognizes the legislative purpose of preserving assets for forfeiture through a liberal construction of the forfeiture statutes. *In re Assets of Billman*, 915 F.2d 916 (4th Cir.1990), *cert. denied sub nom, McKinney v. United States*, 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991); *United States v. Bellomo*, 954 F.Supp. 630, 653–54 (S.D.N.Y.1997); *United States v. Schmitz*, 153 F.R.D. 136, 138–40 (E.D.Wis.1994).

Until recently, the Second Circuit's only pronouncement on the issue of restraint, *United States v. Regan*, 858 F.2d 115 (2d Cir.1988), received varying interpretations among the district courts. *Compare United States v. Gigante*, 948 F.Supp. 279, 281 (S.D.N.Y.1996) (stating that *Regan* "says nothing about the power of a court to compel the forcible pretrial restraint of substitute assets over the asset holder's objection") *with United States v. Bellomo*, 954 F.Supp. 630 (S.D.N.Y.1997) (stating that "it regarded the issue [of pretrial restraint of substitute assets] as foreclosed by *Regan* "). In *United States v. Gotti*, 155 F.3d 144, 149 (2d Cir. 1998), however, the Second Circuit both clari-

---

**12.** Section 853(p) authorizes the forfeiture of substitute assets

[i]f any of the property described in subsection (a) of this section, as a result of any act or omission of the defendant—

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any property of the defendant up to the value of any property described in paragraphs (1) through (5).

21 U.S.C. § 853(p).

fied its holding in *Regan* and articulated its position with respect to the issue of pretrial restraint of substitute assets. The Second Circuit, joining the majority view, held that the pretrial restraint of substitute assets is impermissible. *Id.* at 119–22. It reasoned that "while the pretrial restraint of substitute assets might arguably serve the stated legislative purpose of preserving assets for forfeiture upon conviction, the unambiguous language of [the RICO forfeiture statute,] 18 U.S.C. § 1963(d)(1)(A) provides no authority for the restraints." *Id.* at 121–22.

The only distinctions between *Gotti* and the present case are the forfeiture statutes involved and the type of pretrial government action employed. Neither distinction makes a difference. First, the RICO forfeiture provision and the § 853 forfeiture statute are so similar in both legislative history and statutory language as to warrant similar interpretation. *Compare* 21 U.S.C. § 853 *with* 18 U.S.C. § 1963; *see Gotti,* 155 F.3d 144, 147, 149; *Ripinsky,* 20 F.3d at 362 n. 3; *In re Assets of Martin,* 1 F.3d at 1358; *Roberts v. United States,* 141 F.3d 1468, 1471 n. 5 (11th Cir.1998). Indeed, courts have routinely relied upon the decisions interpreting both in reviewing the legality of pretrial restraint under either.[13] *See, e.g., Gotti,* 155 F.3d 144, 147, 149; *Ripinsky,* 20 F.3d at 362 n. 3; *Roberts v. United States,* 141 F.3d 1468, 1471 n. 5 (11th Cir.1998).

Second, although *Gotti* only held impermissible the pretrial *restraint* of substitute assets, two other circuits have considered and rejected the argument that pretrial *seizure* of substitute assets is authorized by 21 U.S.C. § 853(f).[14] *Field,* 62 F.3d at 249 n. 6 (finding that § 853(f) only authorizes the pre-

trial seizure of property subject to restraint under § 853(e)); *Floyd,* 992 F.2d at 502 (same). These courts, starting with the premise that § 853(e) does not apply to substitute assets, and recognizing that § 853(f) only authorizes pretrial seizure when pretrial restraint under § 853(e) is inadequate, have logically concluded that § 853(f) does not permit pretrial seizure of substituted assets either. *See Floyd,* 992 F.2d at 502. To hold otherwise would not only misconstrue the textual relationship between §§ 853(e) and (f), but also create the anomaly that the government could seize substitute assets before conviction but not engage the less drastic remedy of restraint.

■ Accordingly, the Court concludes that substitute assets may not be seized before conviction pursuant to 21 U.S.C. § 853(f). The government shall promptly return to each defendant any substitute assets it has seized pursuant to the invalid seizure warrants.[15]

### b. Defendants Fabian and Gail Hart

■ Defendants Fabian and Gail Hart ("Harts") also take issue with certain of the real property identified in the indictment as owned by them and subject to forfeiture, but for a different reason. Their argument is that the real property is not subject to forfeiture because it is not owned by them, but by the St. Regis Mohawk Indian Tribe as "Indian country."

Section 853(n) sets forth the procedures for determining claims of ownership by third-parties in forfeited property. That statute requires that the interested third-party as-

---

**13.** The government, in fact, relies heavily upon RICO forfeiture cases here, explicitly recognizing that the two statutes are interchangeable. *See* Government's Memorandum of Law, at 97 n. 34.

**14.** Section 853(f) provides:

The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be suffi-

cient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property. 21 U.S.C. § 853(f).

**15.** The Court's decision does not affect the government's filing of lis pendens on the real properties identified in the indictment as substitute assets. The filing of a lis pendens does not constitute a "restraint" or "seizure" within the meaning of 21 U.S.C. §§ 853(e) or (f), respectively. *United States v. St. Pierre,* 950 F.Supp. 334, 337–38 (M.D.Fla.1996); *United States v. Field,* 867 F.Supp. 869, 873 n. 4 (D.Minn.1994), *aff'd,* 62 F.3d 246 (8th Cir.1995).

sert its claim directly and limits the time frame for contesting forfeiture until the time "[f]ollowing the entry of an order of forfeiture." 21 U.S.C. § 853(n)(1).

Here, the Harts lack standing to assert the ownership interests of the St. Regis Mohawk Indian Tribe in the real property identified in the indictment. *See* 21 U.S.C. § 853(n). Moreover, the St. Regis Mohawk Indian Tribe may not litigate the issue of their ownership *interests* in the subject property prior to entry of an order of forfeiture. *Compare United States v. Scardino* 956 F.Supp. 774, 780 n. 5 (N.D.Ill.1997). Accordingly, the Harts' claim is denied.

## III. CONCLUSION

For the reasons stated above, the Court GRANTS defendants' motions seeking variously: to strike paragraph two of the preamble of the indictment; to dismiss Counts one, four and six of the indictment insofar as each alleges a conspiracy to violate 18 U.S.C. § 546; and the return of "substitute assets" seized by the government. Defendants' motions to dismiss on multiplicity grounds are DENIED WITHOUT PREJUDICE to renew the motions after the close of the government's case or after the close of the entire case. Defendants Larry and Dana Thompson's motion to dismiss Counts one, two and four on duplicity grounds is DENIED. Defendants' motions seeking dismissal of Counts two, three and five are DENIED in all respects. The Harts' claim for the release of property on the ground that it is owned by the St. Regis Mohawk Indian Tribe is DENIED. Any pending motion not addressed either herein or by the Court's bench decision of July 20, 1998 is DENIED.

**IT IS SO ORDERED.**